JERRY LIPPS, INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Jerry Lipps, Inc. v. Commissioner
Docket Nos. 11452-78, 11453-78, 7990-79, 14020-79, 14021-79, 1368-80
United States Tax Court
T.C. Memo 1990-293; 1990 Tax Ct. Memo LEXIS 311; 59 T.C.M. (CCH) 849; T.C.M. (RIA) 90293; June 12, 1990, Filed *311 Decisions will be entered under Rule 155. Respondent claimed increased deficiencies by amendments to answers. Held: (1) The Court has jurisdiction over the disputes as to these increased deficiencies. Sec. 6214(a), I.R.C. 1954. The burden of proof is on respondent as to these items. During 1975 and 1976 petitioner-husband (Lipps) owned substantially all of corporations ARI and JLI. In 1975 and 1976 JLI paid amounts to ARI for "management services" performed by Lipps; ARI paid amounts to Lipps for "management services". Also, JLI paid amounts to Lipps for "terminal agent's fees". Held: (2) Reasonable compensation for Lipps' services determined; amounts apportioned between JLI and ARI; excess payments taxable as dividends to Lipps. JLI paid $ 6,500 per year to ARI in 1975 and 1976, assertedly on account of overhead. Lipps billed ARI $ 5,200 per year in 1975 and 1976, assertedly on account of overhead. In the notices of deficiency, respondent: (a) reallocated the 1975 $ 6,500 back to JLI; (b) disallowed the 1975 and 1976 $ 5,200 deductions of ARI; and (c) determined that Lipps had 1975 dividend income of $ 11,700 ($ 6,500 plus $ 5,200). By amended answer, respondent reallocated *312 the 1976 $ 6,500 back to JLI. Held: (3) Respondent's reallocation of $ 6,500 from ARI to JLI for 1975, under sec. 482, I.R.C. 1954, sustained; burden of proof. (4) Respondent's disallowance of ARI's 1975 $ 5,200 deduction sustained; burden of proof. (5) Lipps received constructive dividend of $ 6,500 for 1975 on account of items (3) and (4). (6) Respondent's reallocation of $ 6,500 for 1976 not sustained; burden of proof (reallocation in amended answer, not in notice of deficiency). (7) Respondent's disallowance of $ 5,200 for 1976 sustained; burden of proof. ARI (accrual basis, TYE April 30, 1975) billed JLI on August 31, 1975, for airplane rent and building rent for the period Sept. 1, 1974 -- Aug. 31, 1975. Held: (8) ARI must accrue into its TYE April 30, 1975, income from these items for the period Sept. 1, 1974 -- Apr. 30, 1975. ARI leased trailers to JLI. ARI billed JLI on August 31, 1976, for trailer demurrage for the period Sept. 1, 1975 -- Aug. 31, 1976. Held: (9) As of April 30, 1976, not all the events had occurred that would enable ARI to determine with reasonable certainty the amount of the trailer demurrage it had earned by that date; ARI is not to accrue into its TYE *313 April 30, 1976, income from this item for the period Sept. 1, 1975 -- Apr. 30, 1976. JLI paid trailer rent to ARI weekly. Held: (10) ARI must accrue into its TYE April 30, 1976, income the amount paid by JLI on Monday, May 3, 1976; burden of proof. Held: (11) ARI must accrue into its TYE April 30, 1976, six other miscellaneous income items; burden of proof. JLI (accrual basis, TYE August 31, 1976) is required to accrue into its TYE August 31, 1976, income from shipping services as to shipments received by consignees on or before August 31, 1976. Held: (12) Determinations made as to which shipments were received by consignees on or before August 31, 1976; income accruable for these shipments for JLI's TYE August 31, 1976. Richard J. Sheehan, Ronald U. Lurie, and Peter L. Clark, for the petitioners. David T. Karzon, Jr. and Reid M. Huey, for the respondent. CHABOT, Judge. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in Federal corporate income tax and deficiencies in Federal individual income tax against the respective petitioners for the years and in the amounts as follows: Taxable Year
Petitioner
Docket No.
Ended
Deficiency
Jerry Lipps, Inc.
11452-78
8/31/75
$ 133,278.58
1368-80
8/31/76
[2] 117,266.29
Astro Rentals, Inc.
11453-78
4/30/75
114,692.89
14021-79
4/30/76
[3] 122,156.42
Jerry Lipps and
7990-79
12/31/75
275,543.00
Ruth Lipps Astro Mfg. Co.
14020-79
5/31/76
1,082.10
*314 These cases have been consolidated for trial, briefs, and opinion. After concessions by all parties (see n. 6, infra), and deemed concessions by petitioners, [4] the issues for decision are as follows: (1) Whether this Court has jurisdiction to consider increased deficiencies claimed by respondent in amendments to answers. *315 (2) As to (i) amounts paid in 1975 and 1976 by Jerry Lipps, Inc. (hereinafter sometimes referred to as "JLI") to Astro Rentals, Inc. (hereinafter sometimes referred to as "ARI") as "management fees", (ii) amounts paid *316 in 1975 and 1976 by ARI to petitioner Jerry Lipps (hereinafter sometimes referred to as "Lipps") as "management fees", and (iii) amounts paid in 1975 and 1976 by JLI to Lipps as "terminal agent's fees" -- (a) whether the payors' deductions are not allowable because amounts exceed reasonable compensation (sec. 162(a)(1) [5]) or because income and expenses are properly reallocable under section 482; (b) whether the payments by JLI to ARI give rise to constructive dividends to Lipps; and (c) whether those 1975 payments that are includable in Lipps' income are earned income to him for "maxitax" purposes (sec. 1348).
(3) Whether, under section 482, respondent properly reallocated to JLI $ 6,500 per year of overhead charges billed by ARI to JLI for 1975 and 1976. (4) Whether $ 5,200 per year of overhead charges paid by ARI to Lipps in 1975 and 1976 are ordinary and necessary *317 business expenses deductible by ARI under section 162. (5) Whether Lipps received constructive dividends in 1975 on account of (i) the $ 6,500 billed to JLI by ARI, (ii) the $ 5,200 paid by ARI to Lipps, or (iii) both. (6) Whether ARI must accrue into income for its taxable year ended April 30, 1975, amounts of airplane and building rent attributable to periods ending April 30, 1975, but not billed to JLI until August 31, 1975. (7) Whether ARI must accrue into income for its taxable year ended April 30, 1976, amounts of trailer demurrage attributable to periods ending April 30, 1976, but not billed to JLI until August 31, 1976. (8) Whether ARI must accrue into income for its taxable year ended April 30, 1976, amounts of weekly trailer rent it received from JLI on Monday, May 3, 1976. (9) Whether ARI must accrue into income for its taxable year ended April 30, 1976, six other miscellaneous items. (10) Whether certain shipments were received by consignees on or before August 31, 1976, so that the income from these shipments must be accrued by JLI for its taxable year ended August 31, 1976. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits *318 are incorporated herein by this reference. When the petitions were filed in the instant cases, petitioners JLI , ARI, and Astro Manufacturing Company [6] (hereinafter sometimes referred to as "AMC") had their principal places of business and principal offices in Cape Girardeau, Missouri, and petitioners Lipps and Ruth Lipps husband and wife, resided in Cape Girardeau. General; Reasonable Compensation
In 1975, Lipps was 46 years old and had been in the trucking business for about 29 years. Lipps formed JLI, a Florida corporation, in 1959. During all relevant times, JLI was a common and contract motor carrier on irregular routes, primarily hauling building materials, paper and paper products, and some iron and steel articles. Lipps formed ARI, a Missouri corporation, about 1969. JLI used the accrual method of accounting and used a taxable year ending on August 31. At all relevant times, ARI and AMC used the accrual *319 method of accounting, ARI used a taxable year ending on April 30, and AMC used a taxable year ending on May 31. Lipps and Ruth Lipps used the calendar taxable year. Neither JLI, ARI, nor AMC has ever paid any dividends to its shareholders. At all relevant times, Lipps owned 88.9 percent of JLI's stock; the remaining 11.1 percent was owned by William Morrow, a JLI employee. At all relevant times, Lipps owned 90 percent of the stock of ARI and AMC. [7] At all relevant times, Lipps was president of JLI, ARI, and AMC. At some point, petitioner Ruth Lipps was secretary-treasurer of JLI, but she did not perform the duties of that office and was not paid for holding that office. At all relevant times, the only other officer or employee of ARI was Hazel Seabaugh (hereinafter sometimes referred to as "Seabaugh"), who was secretary-treasurer and did general office work and bookkeeping. During 1975 and 1976 the directors of JLI were Lipps, petitioner Ruth Lipps, and William Morrow. JLI does not employ *320 drivers, nor does it own tractors or trailers. Rather, it contracts with owner-operators of tractors, many of whom also own and provide trailers. The standard arrangement is for JLI to hire an owner-operator (hereinafter sometimes referred to as a "lessor-driver"), who is paid a portion of the gross revenues from each of the shipments carried by that owner-operator. An owner-operator who does not furnish a trailer is paid 65 percent of the gross revenue; one who does furnish a trailer is paid 75 percent. When JLI has to furnish a trailer, it rents the trailer from ARI for 10 percent of the gross revenues from the shipment. This 10-percent rent charge is standard in the industry. Before Lipps formed ARI, Lipps leased trailers to JLI at the standard 10-percent rent. After Lipps formed ARI, he leased trailers to ARI. Also, ARI bought some trailers. During ARI's taxable year ended April 30, 1976, Lipps leased 27 trailers to ARI for periods ranging from 19 days to the entire year. ARI in turn leased these trailers, and also 47 trailers that ARI owned, to JLI. AMC had its subsidiary, Cape Trailer Sales, Inc., perform maintenance services for the trailers. JLI entered into two types *321 of trailer leases, permanent leases and trip leases. The trip lease is a lease entered into for the purpose of making one shipment using that particular lessor. Entering into a trip lease involves a safety inspection and the completion of certain paperwork for each trip, much of which is not necessary for a permanent lease. JLI operated about 15 trucking terminals during 1975. Except for the terminals in Pensacola (Fla.), St. Louis (Mo.), Cape Girardeau (Mo.), Wickliffe (Ky.), and Taylorville, (Ill. ), all JLI terminals were operated by terminal agents during 1975 and 1976. JLI terminal agents performed the following functions: (a) kept office hours to meet the shippers' requirements; (b) issued JLI checks to lessor-drivers as advances on loads; (c) reported any service failures or complaints to JLI's main office; (d) covered all shippers' loads at all times (i.e., matched lessor-drivers and trailers with shippers' needs); (e) inspected trucks to ensure compliance with all State and Department of Transportation regulations; (f) paid with their own funds terminal expenses such as telephone, utilities, and rent; (g) hired and paid with their own funds whatever terminal personnel *322 they desired; (h) filled out the paperwork required under the trip lease system; and (i) solicited new business and checked on existing customers to ensure they were receiving good service.
JLI's terminal agents were forbidden to own any trailers; they customarily did not hire any people to assist them but personally performed all of their duties as terminal agents. In 1975 and 1976, with regard to the Cape Girardeau terminal, three dispatchers maintained office hours to meet shippers' requirements, covered all shippers' loads, made advances to lessor-drivers, serviced failures and complaints, and filled out the necessary paper work. At the Cape Girardeau terminal, safety inspections were performed by the dispatchers, by Jack Gleason (hereinafter sometimes referred to as "Gleason"), by personnel employed by AMC's subsidiary, or by Lipps. In 1975 and 1976, JLI paid two employees to perform the terminal agent duties at the Pensacola terminal. The Pensacola terminal was owned by ARI; JLI paid that terminal's telephone and utility costs for 1975 and 1976. JLI paid to its terminal agents 6 percent of the gross receipts from freight that was derived from their respective areas. This was *323 a standard rate for the industry. The revenue attributable to certain terminals for each of the periods indicated is as shown on table 1. Table 1 Sep. 1, 1974-
Sep. 1, 1975-
Terminal
Aug. 31, 1975
Aug. 31, 1976 Cape Girardeau, Mo.
$   867,672.10 [8]
$ 1,074,078.26
("Nielly's Landing")
Wickliffe, Ky.
NA [8]
116,821.59
Taylorville, Ill.
347,927.54
437,388.50
Burlington, Iowa, and Reading, Va.
NA [9]
85,369.97
St. Louis, Mo.
515,552.82
515,956.79
Pensacola, Fla.
NA [9]
567,183.07
Springfield, Mo.
NA [9]
67,105.25
Totals
$ 1,731,152.46 $ 2,863,903.43 In 1975 and 1976, JLI employed an individual to perform the terminal agent functions at the St. Louis terminal. JLI paid the telephone and utility costs for the St. Louis terminal during 1975 and 1976. At the JLI terminals in Pensacola and St. Louis during 1975 and 1976, all the functions normally performed by terminal agents were performed by JLI employees. In 1975 and 1976, JLI had two employees at Pensacola *324 and one at St. Louis. In 1975 and 1976, JLI had about 22 employees. All of them were located at the Cape Girardeau terminal, except for those at the Pensacola and St. Louis terminals. At all relevant times, Dorothy J. Gilbert (hereinafter sometimes referred to as "Gilbert") was JLI's safety director and office manager. Gilbert supervised all aspects of safety requirements; three JLI employees assisted her in this function. Gilbert and her staff conferred with terminal agents to the extent necessary to maintain proper safety standards. Gilbert also was in charge of maintaining various records in accordance with Department of Transportation regulations concerning permanent lease operators. At all relevant times, Gleason was a safety inspector and sales representative for JLI. In these capacities he performed the following duties: (a) visited terminal offices to aid agents with truck inspection procedures; (b) spot-checked trucks over the road for compliance with safety requirements; and (c) called on various shippers to solicit new business and help eliminate problems. Gleason also supervised terminal agents. At all relevant times Seabaugh was JLI's bookkeeper. Lipps was the chief *325 executive officer of JLI and ARI. Other than Lipps, no one performed overall management functions for ARI. Lipps was directly involved in decisions concerning JLI's operations in purchasing, finance, repairs, maintenance, marketing, personnel, and safety. ARI's principal business activity involved the leasing to JLI of transportation equipment (primarily trailers), buildings, land, and an airplane. At all relevant times, AMC's only active division, Cape Trailer Sales, was involved in the repair and maintenance of trucks and trailers. On April 30, 1975, Lipps billed ARI $ 155,100, which Lipps characterized as a "management fee". ARI paid the $ 155,100 to Lipps in July 1975. The invoice on which the $ 155,100 was billed indicates that the "management fee" consists of a $ 3,300 monthly charge per trailer for 47 trailers. (Evidently, it was intended to show an annual rate of $ 3,300, or a monthly rate of $ 275, per trailer.) On April 30, 1976, Lipps billed ARI $ 199,800, which Lipps characterized as a "management fee". ARI paid $ 199,800 to Lipps in July 1976. The invoice on which the $ 199,800 was billed indicates that the "management fee" consists of a $ 2,700 annual charge per *326 trailer for 47 trailers "(Astro)" and for 27 trailers "(Lipps)". On August 31, 1975, ARI billed JLI $ 140,000, which ARI characterized as a "management fee". JLI paid the $ 140,000 to ARI in November 1975. On August 31, 1976, ARI billed JLI $ 141,000, which ARI characterized as a "management fee". JLI prepaid the $ 141,000 on August 8, 1976. ARI did not have any written agreement with JLI relating to the performance of management services, and did not have any employees who performed management services for JLI, during the period September 1, 1974, through August 31, 1976. Also, ARI did not have any written agreement with Lipps relating to the performance of management services on behalf of JLI during this period. In 1975, JLI paid $ 46,000 to Lipps, which amount JLI characterized as "terminal agent's fees". In 1976, JLI paid $ 166,000 to Lipps, which amount JLI characterized as "terminal agent's fees". During 1975 and 1976: JLI made 17 loans to Lipps; Cape Trailer Sales made 1 loan to Lipps; JLI made 1 loan to AMC; JLI made 3 loans to ARI; Lipps made 3 loans to ARI; and ARI made 4 loans to JLI. All these loans were repaid, two on the same day they were made, most within a few *327 months, almost all (25 out of 29) within 1 year. The median time was 4 months and 13 days. The loan amounts ranged from $ 2,391.83 to $ 392,000. Five of the loans were $ 10,000 or less; eight were $ 100,000 or more. The median amount was $ 26,000. No interest was paid on any of these loans. Lipps reported gross receipts or profit, [10] total deductions, and net profits or (loss) from a sole proprietorship known as Jerry Lipps Truck Service, on schedules C, Form 1040 as shown in table 2. Table 2 Gross
Total
Net Profit
Year
Receipts/Profit
Deductions
(Loss)
1960
$ 241,767.75  $ 255,606.67
$  13,838.92)
1961
152,252.77  150,372.35
1,880.42 1962
143,807.26  144,757.74
(950.48)
1963
150,165.69  157,301.10
(7,135.41)
1964
200,690.72  195,918.05
4,772.67 1965
205,075.48  215,767.17
(10,691.69)
1966
120,001.92  132,186.14
(12,184.22)
1967
86,323.74  50,803.59
35,520.15 1968
106,513.66  34,784.71
71,728.95 1969
57,400.62  25,940.38
31,460.24 1970
83,241.89  40,641.15
42,600.74 1971
98,175.05  44,792.47
53,382.58 1972
102,482.84  43,969.42
58,513.42 1973
136,392.06  75,929.63
60,462.43 1974
301,017.25  119,360.33
181,656.92 1975
220,534.41  124,564.90
95,969.51 1976
501,765.12  383,892.96
117,872.16 *328 The schedules C do not show how much of the receipts, deductions, and net profits are attributable to the management fees payments by ARI and the terminal agent's fees payments by JLI, and how much are attributable to other activities (e.g., leasing trailers to ARI). JLI reported gross receipts, total income, and taxable income before net operating loss deduction and special deductions for its years of operation as shown in table 3. Table 3 Taxable Year
Gross *
Total *
Taxable
Ended Aug. 31
Receipts
Income
Income (Loss)
1961
$    52  $  52  (1,071.89)
1962
61  61  436.91 1963
111  111  43.30 1964
516  26  (51.44)
1965
595  42  842.14 1966
492  43  (4,371.56)
1967
806  96  25,473.30 1968
1,106  130  38,342.45 1969
1,079  143  35,630.00 1970
1,252  147  35,551.95 1971
2,422  223  94,779.53 1972
3,302  311  96,055.23 1973
4,716  389  58,739.19 1974
5,097  471  65,221.42 1975
5,508  535  64,069.13 1976
7,645  710  41,674.66  ARI reported gross receipts, total income, and taxable income before net operating loss deduction and special deductions for its years of operation as shown in table 4. Table 4 Taxable Year
Gross * *329 Total *
Taxable
Ended April 30
Receipts
Income
Income (Loss)
1970
$  26   $  26  $    (92.02)  1971
92   92  20,332.51   1972
179   179  52,968.69   1973
212   212  26,538.06   1974
513   513  63,617.46   1975
468   468  3,359.46   1976
490   490  42,398.01   1977
662   662  40,676.15   For their taxable years ending in 1975 and 1976, JLI, ARI, and AMC elected to divide their surtax exemptions [11] as shown in table 5. Table 5 Corporation
1975
1976 JLI
$ 25,000
$  3,800
ARI
4,167
21,200
AMC
4,167
-0-
But for the management fees (from JLI to ARI, and from ARI to Lipps) and the terminal agent's fees (from JLI to Lipps), JLI and ARI would have had taxable income of about the amounts shown in table 6 for their 1975 and 1976 taxable years. Table 6 Taxable Year
Taxable Income *
Ending In
JLI
ARI
Total
1975
$ 250
$  18
$ 268
1976
348
101
449
Table 7 summarizes the parties' positions and the Court's findings regarding the fair market value of Lipps' services (management fees plus terminal agent's fees). Table 7 ARI's and JLI's
Notice of
Petitioners'
Taxable year ending in--
Tax Returns
Deficiency
Expert
1975
Management fees
JLI to ARI
$ 140,000 -0- Not    ARI to Lipps
155,100 $ 100 Terminal agent's fee
less   JLI to Lipps
46,000 -0- Total compensation to Lipps
* $ 201,100 $ 100 than   amounts
1976
paid by
Management fees
JLI to ARI
$ 141,000 -0- ARI and
ARI to Lipps
199,800 $ 900 Terminal agent's fee
JLI  JLI to Lipps
166,000 -0- Total compensation to Lipps
* $ 365,800 $ 900 *330 Respondent's
Court's
Taxable year ending in--
Expert
Findings
1975
Management fees
JLI to ARI
JLI      JLI      ARI to Lipps
$  79,300
$ 174,900
Terminal agent's fee
ARI      ARI      JLI to Lipps
39,000
15,100
Total compensation to Lipps
$ 118,300
$ 190,000
1976
Management fees
JLI to ARI
JLI      JLI      ARI to Lipps
$ 66,600
$ 220,000
Terminal agent's fee
ARI      ARI      JLI to Lipps
62,400
20,000
Total compensation to Lipps
$ 129,000
$ 240,000
Overhead
On August 31, 1975, and August 31, 1976, ARI billed JLI $ 6,500 which ARI characterized as "overhead". JLI paid the 1975 billing in November 1975 and paid the 1976 billing on August 8, 1976. On April 30, 1975, and April 30, 1976, Lipps billed ARI $ 5,200, which on each bill was characterized as "overhead". Airplane Rent
On August 31, 1975, ARI billed JLI $ 21,000 for "airplane rent" for the period September 1, 1974, through August 31, 1975, at a rate of $ 1,750 per month. There was no written lease agreement between JLI and ARI regarding the airplane rent. ARI reported in income for its taxable year ended April 30, 1976, the $ 21,000 in airplane rent billed to JLI on August *331 31, 1975. Building Rent
On August 31, 1975, ARI billed JLI $ 15,000 for "Building Rents (Macon & Pensacola)" for the period September 1, 1974, through August 31, 1975. There was no written lease between ARI and JLI regarding the building rent. ARI reported in income for its taxable year ended April 30, 1976, the $ 15,000 in building rents billed to JLI on August 31, 1975. Demurrage; Trailer Rent
During the period May 1, 1974, through April 30, 1976, ARI owned 47 trailers which it leased to JLI. [12] ARI charged JLI a rental fee for use of the trailers equal to 10 percent of JLI's load revenues [13] attributable to the 47 trailers rented from ARI. JLI paid to ARI the 10-percent trailer rental fee on a weekly basis, generally each Monday. ARI also billed JLI an additional 10 *332 percent of load revenues as a trailer demurrage charge. A trailer demurrage charge is a charge to the lessee for periods the lessee has possession of the trailers but the trailers remain idle. In general, if the trailers were to be idle a large part of the time, then the demurrage charge would increase; conversely, if the trailers were to be idle a small part of the time, then the demurrage charge would decrease. On August 31, 1975, ARI billed JLI $ 75,795 as a trailer demurrage charge for the period September 1, 1974, through August 31, 1975. ARI's bill describes the trailer demurrage charge as "Additional 10% trailer rent". ARI did not report in income any of the $ 75,795 for its taxable year ended April 30, 1976, but rather included this amount in income for its taxable year ended April 30, 1976. On August 31, 1976, ARI billed JLI $ 137,660 as a trailer demurrage charge for the period September 1, 1975, through August 31, 1976. ARI's bill described the trailer demurrage charge as "Additional 10% trailer rent". ARI did not report in income any of the $ 137,660 for its taxable year ended April 30, 1976, but rather included this amount in income for its taxable year ended April *333 30, 1977. Each of ARI's trailer demurrage billings of August 31, 1975, 1976, 1977, 1978, and 1979, was in the amount of 10 percent of the load revenues on the leased trailers for the 12 months ended on the billing date. On Monday, May 3, 1976, JLI paid (and ARI received) a trailer rent payment of $ 2,200.89, which was equal to 10 percent of the load revenues that JLI received from shippers the week before. ARI reported the $ 2,200.89 as income for its taxable year ended April 30, 1977. Miscellaneous Items
The items listed in table 8 were reported in income for ARI's taxable year ended April 30, 1977. Table 8 Lykes Bros.
$    77.70
Schneider
446.85
St. Louis Rway
150.00
Lykes Bros.
602.06
Sea Train
254.73
Schneider
59.69
Total
$ 1,591.03
Respondent determined that the items listed in table 8 were properly accruable by ARI for its taxable year ended April 30, 1976. Accrued Freight Income
During 1975 and 1976, JLI paid 65 percent of gross freight revenue from shippers to lessor-drivers who furnished their own tractors but used trailers supplied by JLI. During 1975 and 1976, JLI paid 75 percent of gross freight revenue from shippers to lessor-drivers who furnished their own tractors and trailers. *334 JLI normally advanced to a lessor-driver about one-half of the lessor-driver's share of the gross freight revenues before the lessor-driver left the JLI terminal to pick up the load. JLI did not pay the lessor-driver the remainder of the amount due until after the lessor-driver delivered the load to the consignee and brought to JLI a signed delivery bill as proof that the load had been delivered. JLI kept a record of the loading date of the goods to be shipped. The loading dates of shipments disputed in this issue, the number of freight bills representing these shipments, and the revenue amounts are set forth in table 9. Table 9
1976
Number of
Revenue
Loading Date
Freight Bills
Amount
6/30
1
$    328.67
8/04
1
2,018.00
8/06
1
457.80
8/11
1
688.00
8/12
3
2,035.49
8/13
1
715.68
8/14
1
477.49
8/15
1
557.00
8/16
3
1,580.58
8/17
2
1,385.60
8/18
5
3,319.16
8/20
5
2,378.72
8/23
5
3,093.61
8/24
8
5,707.83
8/25
12
9,258.47
8/26
16
10,862.85
8/27
12
7,950.51
8/28
3
2,592.04
8/30
8
5,707.64
8/31
5
2,379.86
9/01
2
931.24
Totals
96
$ 64,426.24
JLI did not keep a record of the delivery dates. However, JLI generally kept the documents associated with each shipment. In about 40 percent of the documents, signatures on receipts are dated. All five of the loads loaded *335 on August 31, 1976, were delivered on or after September 1, 1976. Of the eight loads loaded on August 30, 1976, the loads with the following revenue bill numbers were delivered on or after September 1, 1976: 77893, 78123, 77896, 77875, and 78193. All the loads loaded on or before August 28, 1976, were delivered on or before August 31, 1976. Once a load was delivered and the delivery bill signed, the shipper owed to JLI the amount of the charge for the shipment. As of August 31, 1976, the total of the amounts of the lessor-drivers' share of the gross freight revenues remaining unpaid was $ 47,641.57; this amount was accrued and deducted by JLI as an account payable for the taxable year ended August 31, 1976. Of this amount JLI accrued and deducted $ 29,569.18 as accounts payable to lessor-drivers on shipments for which the gross freight revenues, totaling $ 64,426.21, were not included in income by JLI for its taxable year ending August 31, 1976. OPINION I. General Comments
Lipps created a complex of corporations, for what may well have been good business reasons. Lipps "ran the show", apparently with success when dealing with outsiders. When dealing with, and within, the corporate *336 family, Lipps seemed to ignore the question of what hat he wore. As a result, there often is little or no meaningful explanation for the amount or timing of some of the transfers among the corporations, or from a corporation to Lipps. This paucity of meaningful explanation often makes it difficult to discern either justifications or ulterior motives. Of the issues for decision, the question of reasonable compensation involves the most money, the most trial time, the most space in briefs, and (we suspect) the most emotional concern. Respondent's determinations in the notice of deficiency that Lipps' services for 2 years were worth a total of only $ 1,000 ($ 100 for 1975, $ 900 for 1976) did not add rationality to this dispute. The unreality of those determinations is made evident by respondent's expert witness, who testified that Lipps' services for these 2 years were worth $ 247,300 -- 24,630 percent more than the official determinations. Sensibly, respondent's counsel adopted the view of respondent's expert witness rather than attempting to defend the amounts determined in the notices of deficiency. We have done what we could with a relatively confused record which, we believe, *337 generally reflects the underlying confused facts. II. Jurisdiction
Before we consider the substantive issues, we face several related jurisdictional challenges presented by petitioners on brief. Petitioners contend that "This Court lacks subject matter jurisdiction to determine" several matters raised by respondent in amended answers. Petitioners rely on Magma Corporation v. Commissioner, an unreported case ( W.D. Ark. 1981, 48 AFTR 2d 81-6000, 81-2 USTC par. 9634), and Ross Glove Co. v. Commissioner, 60 T.C. 569, 595 (1973). Respondent points out that petitioners stated in open court, at the calendar call, that they had no objection to our granting the motions for leave to amend the answer in docket Nos. 1368-80 (JLI 1976) and 14021-79 (ARI 1976), which asserted increased deficiencies. See nn. 2 and 3, supra. He contends that those objections, raised for the first time on brief, are untimely. Respondent also relies on section 6214(a). We agree with respondent's conclusions that we have jurisdiction over the matters raised in the amended answers. It is well settled that this Court can proceed in a case only if we have jurisdiction and that any party, or the Court sua sponte, *338 can question jurisdiction at any time, even after the case has been tried and briefed. Normac, Inc. & Normac International v. Commissioner, 90 T.C. 142, 147 (1988); Kahle v. Commissioner, 88 T.C. 1063 n. 3 (1987), and cases cited therein. We have jurisdiction to determine jurisdiction [14] and "whenever it appears that this Court may not have jurisdiction to entertain the proceeding that question must be decided." Wheeler's Peachtree Pharmacy, Inc. v. Commissioner, 35 T.C. 177, 179 (1960); 508 Clinton Street Corp. v. Commissioner, 89 T.C. 352, 353 n. 2 (1987).Where this Court's jurisdiction is duly challenged, the jurisdiction must be affirmatively shown. Wheeler's Peachtree Pharmacy, Inc. v. Commissioner, 35 T.C. at 180; Louisiana Naval Stores, Inc. v. Commissioner, 18 B.T.A. 533 (1929). Thus, respondent errs in his contention that petitioners' *339 jurisdictional challenges were untimely raised. In the instant cases, respondent sent notices of deficiency to all petitioners, determining deficiencies in income tax for each of the years before us. The amendments to answers claim increased deficiencies in income tax for some years already in issue and present some new theories for those deficiencies that had already been determined. Section 6214(a)[15] specifically gives this Court jurisdiction to redetermine deficiencies in amounts greater than originally determined, if respondent has timely asked for the increases. Also, it is well settled that respondent's determinations may be upheld for reasons other than those assigned in the notices of deficiency. See, e.g., Estate of Horvath v. Commissioner, 59 T.C. 551, 555 (1973), and cases there cited. The question of whether a party will be permitted, at a particular point, to amend the pleadings or raise new matters depends on considerations of surprise and prejudice. Estate of Horvath v. Commissioner, supra.Also, the burden of proof is on respondent as to increased deficiencies and new matters. Rule 142(a). Disputes about these matters do not go to our jurisdiction. Petitioners' *340 jurisdictional challenge fails. Petitioners are not helped by the cases on which they rely to challenge our jurisdiction. In Magma Corporation, the District Court pointed out that this Court does not have jurisdiction over a deficiency case unless a notice of deficiency has been sent. We agree. In the instant cases, notices of deficiency were sent. In Ross *341 Glove, the question was not our jurisdiction but rather the wisdom of allowing respondent to raise an issue at the time and in the "vague and obscure manner" in which he sought to do so. 60 T.C. at 595. We conclude that, in the instant cases, we have jurisdiction to deal with respondent's contentions. See Rule 142(a), regarding respondent's burden of proof on these matters. (However, we note that most of these matters as to which respondent has the burden of proof are decided in the instant cases on the basis of the preponderance of the evidence; in those instances, it is immaterial who has the burden of proof. Deskins v. Commissioner, 87 T.C. 305, 323 n. 17 (1986).) III. Reasonable Compensation
In form, JLI paid management fees to ARI. On August 31, 1975 (the end of JLI's fiscal year), ARI billed JLI for $ 140,000; JLI paid the $ 140,000 to ARI in November 1975. On August 31, 1976, ARI billed JLI for $ 141,000; JLI prepaid the $ 141,000 to ARI on August 8, 1976. In form, ARI paid management fees to Lipps. On April 30, 1975 (the end of ARI's fiscal year), Lipps billed ARI for $ 155,100; ARI paid the $ 155,100 to Lipps in July 1975. On April 30, 1976, Lipps billed ARI for $ *342 199,800; ARI paid the $ 199,800 to Lipps in July 1976. In form, JLI paid terminal agent's fees to Lipps. JLI paid $ 46,000 and $ 166,000 to Lipps in 1975 and 1976, respectively. Respondent contends that (1) Lipps should be charged with income on account of JLI's payments of management fees to ARI. Respondent then adds this to the management fees ARI paid to Lipps and the terminal agent's fees JLI paid to Lipps and asserts that the totals are excessive as compensation for Lipps' personal services. [16] Respondent contends that (2) the payors should not be allowed to deduct the excess and (3) the excess should be treated as dividends to Lipps (thus, not eligible for "maxitax" treatment). Petitioners maintain that substance *343 was in accord with form, that Lipps should not be taxed on JLI's payments of management fees to ARI, and that Lipps is entitled to maxitax treatment for both the management fees and the terminal agent's fees he received. We agree largely with petitioners' conclusions as to 1975. We agree in part with petitioners' conclusions and in part with respondent's conclusions as to 1976. The parties agree that, to the extent of the amounts that would be reasonable amounts of compensation to Lipps, (1) the amounts actually paid were paid as compensation (see Paula Construction Co. v. Commissioner, 58 T.C. 1055, 1058-1059 (1972), affd. without published opinion 474 F.2d 1345 (CA5 1973)), (2) these amounts are earned income for purposes of the "maxitax" provisions (sec. 1348), and (3) these amounts are deductible by JLI and ARI (sec. 162(a)(1)). The parties also agree that payments in excess of these amounts are to be treated as dividends to Lipps. The question of reasonableness of compensation is one of fact which must be resolved on the basis of all the facts and circumstances in the case. Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner , 528 F.2d 176, 179 (CA10 1975), affg. 61 T.C. 564 (1974); *344 Pacific Grains v. Commissioner, 399 F.2d 603, 605 (CA9 1968), affg. a Memorandum Opinion of this Court; [17]Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1155 (1980); Levenson & Klein v. Commissioner, 67 T.C. 694, 711 (1977).Many factors are relevant in determining whether amounts paid to a person were reasonable compensation, including the following: the person's qualifications; the nature, extent, and scope of the person's work; the size and complexities of the business; comparison of size and complexities with similar businesses; and the prevailing rates of compensation for comparable positions in comparable concerns. No single factor is decisive; rather, we must consider and weigh the totality of facts and circumstances in arriving at our decision. Mayson Mfg. Co. v. Commissioner, 178 F.2d 115, 119 (CA6 1949), revg. a Memorandum Opinion of this Court dated November 16, 1948. In evaluating the record in these cases, we bear in mind that respondent's determinations as to matters of fact in the notice of deficiency are presumed to be correct and petitioners are charged with the burden of establishing that the management fees and terminal agents' *345 fees paid were reasonable compensation for Lipps services, within the meaning of section 162(a)(1). [18]
Laure v. Commissioner, 70 T.C. 1087, 1097 (1978), affd. in part and revd. in part without discussion of this point 653 F.2d 253 (CA6 1981); Levenson & Klein v. Commissioner, supra; Shield Co. v. Commissioner, 2 T.C. 763, 769-770 (1943). Also, transactions between a corporation and its sole or controlling shareholder are subject to close scrutiny. Tulia Feedlot, Inc. v. United States, 513 F.2d 800, 805 (CA5 1975); Levenson & Klein, Inc. v. Commissioner, supra.Finally, respondent has broad discretion in applying section 482[19] *347 and his determination must be sustained unless he has abused his discretion. Jordan v. Commissioner, 60 T.C. 872, 882 (1973), affd. 514 F.2d 1209, 1210 (CA8 1975).Petitioners generally have the burden of proving that respondent's *346 determination was arbitrary, capricious, or unreasonable. Your Host, Inc. v. Commissioner, 489 F.2d 957, 960 (CA2 1973), affg. 58 T.C. 10, 23 (1972); Grenada Industries, Inc. v. Commissioner, 17 T.C. 231, 255 (1951), affd. 202 F.2d 873 (CA5 1953).The standard to be applied is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. See sec. 1.482-1(b)(1), Income Tax Regs.
On the basis of the record as a whole, we have made the ultimate findings of fact set forth, supra (table 7). The following indicia of relatively high reasonable compensation are present in the instant cases: (1) Lipps was the chief executive officer of both ARI and JLI. Lipps managed ARI by himself. Lipps performed a wide variety of management functions for JLI. (2) JLI and ARI grew substantially and fairly steadily over the years. (On the other hand, their profitability fluctuated widely.) (3) According to respondent's expert, JLI's and ARI's combined return on total net assets far exceeded the highest returns of other motor freight companies with similar total revenues, and matched the top of the range of returns of other motor freight companies with about three times JLI's and ARI's combined total revenues.
The following indicia of relatively low reasonable compensation (and possible dividend status) are present in the instant cases: (1) Lipps' compensation as both a percentage of net assets and as a percentage *348 of revenue exceeded that of most comparable companies. (2) Lipps controlled ARI and JLI and was free to set his salary based on what suited him best. (3) There is evidence suggesting that Lipps' compensation was determined at the end of the year and was based, at least in part, on the profitability of the companies in the previous year. (4) Neither JLI, ARI, nor AMC has ever paid any dividends to its shareholders.
Petitioners' expert witness, Kenneth M. Manning (hereinafter sometimes referred to as "Manning"), refused to present to us any level of maximum reasonable compensation. He contented himself with the conclusion that the amounts paid to Lipps in 1975 and 1976 were reasonable. When, on cross examination, he was asked to explain the methodology that led him to conclude that Lipps' numbers were reasonable, he insisted that the process was essentially subjective and intuitive. Many of the comparables that Manning chose involved payments to affiliated corporations. Manning believed, from his knowledge of the industry, that "it can be assumed" that the intercompany payments shown on Interstate Commerce Commission reports for the comparable companies are compensation to officers *349 and shareholders. In his analysis, he so treated these payments. He testified as follows with regard to his understanding: Q [Karzon] Okay. You -- you indicate that payments made by your comparables to affiliated companies can be assumed to include payments to carrier owners. Are you also assuming that the payments to affiliates include management fees or payments for compensation? A [Manning] Whether they're labeled management fees or whether they are the profits of the company which is then distributed to the owner, who is -- who are -- the owners who are the same as those of the trucking company, it's a question of labels, it's not a question of substance.
Unfortunately, the usefulness of Manning's expert testimony to "assist the trier of fact to understand the evidence or to determine a fact in issue" (Fed. R. Evid. 702) depends precisely on the substantive distinction between payment of compensation and distribution of profits (i.e., dividends), the very distinction that Manning describes as "a question of labels, * * * not a question of substance." Respondent's expert witness, Louis A. Paone (hereinafter sometimes referred to as "Paone"), chose as the principal criterion the *350 ratio of officers' compensation to "total net assets". He explained that, in what he selected as comparable companies, that ratio varied from company to company less than other ratios. He did not present for us the reasoning process that led him from that relative lack of variation to his conclusion that that ratio was the appropriate principal criterion. Paone acknowledged that he did not know much about the trucking industry and had no way of knowing whether or not anyone else in that industry was paid more than Lipps. It strikes us that setting compensation almost entirely on the basis of value of assets managed may be usual in the management of investment assets, such as a stock portfolio. However, JLI and ARI are not in the stock portfolio business. JLI, especially, involves bringing together people who have their own assets and skills (drivers who own or control tractors and, in many instances, trailers) and people with a demand for services (shippers). The management of such an enterprise involves organization of operations and supervision of people, not simply decisions to buy or sell assets. In this respect, we agree with Manning's criticism of Paone's expert witness *351 report. Paone's only other significant criterion was an upward adjustment of 10 percent of the corporations' after-tax net income to reflect Lipps' superior performance. The following colloquy is Paone's explanation of his choice of 10 percent as the proper adjustment level. Q [Sheehan] Well, why did you decide to do it this way? A [Paone] Just for performa -- why did I decide to do -- Q Yeah -- A -- to give Jerry Lipps the additional ten percent? Q -- Yeah. A I gave him ten percent additional compensation, 10% of the net income of the corporations, primarily for performance standards, relative to the comparables. Q Was that arbitrary on your part? A It was, yeah. I would have to say it's -- the figure of ten percent. Q Right. The theory is not, but the figure is. A Well, the theory's arbitrary too, since it's my report I mean, my -- Q Well, did you con -- A -- it's all arbitrary in that, this is my report, and I decided this was the way to determine reasonable compensation.
Even in the context that Paone chose, efficient use of business assets, Paone's own figures showed that JLI and ARI (and, presumably, Lipps) did outstandingly well, as may be seen in table 10. Table 10 Return on total
net assets of --
1975
1976
Companies with gross
range-losses to
range-1.3%-10.1%
revenues about equal
7.9%
(median 7.3%)
to JLI and ARI
(median 3.75)
Companies with gross
range-0% -16.4%
range-1.5%-14.5%
revenues about 3 times
(median 8.2%)
(median 10.7%)
JLI and ARI
JLI and ARI
14.6%
14.5%
*352 Poane criticized Manning's suggestion that the ratio of officers' compensation to gross revenues was an important criterion for reasonableness of compensation. Paone criticized Manning's choice of comparable companies and also Manning's numbers, as not being truly comparable to the JLI-ARI operation. Paone preferred his own comparables and his own numbers Paone's comparables and numbers show that, for 1975, the ratio of officers' compensation to gross revenues ranged from 1.3 percent to 3.3 percent. Paone's analysis of Manning's comparables shows that, for 1975, the ratio of officers' salaries to operating revenues ranged from 0.6 percent to 7.0 percent. For 1975, the $ 201,000 that JLI and ARI paid to Lipps (see table 7) was 3.4 percent of gross revenues (see tables 3 and 4). Paone's recommendation ($ 118,300) would be only 1.9 percent of gross revenue. Our finding ($ 190,000) is 3.2 percent. Paone's comparables and numbers show that, for 1976, the ratio of officers' compensation to gross revenues ranged from 0.8 percent to 2.7 percent. Paone's analysis of Manning's comparables show that, for 1976, the ratio of officers' salaries to operating revenues ranged from 0.7 percent *353 to 6.6 percent. For 1976, the $ 365,800 that JLI and ARI paid to Lipps (see table 7) was 4.5 percent of gross revenues (see tables 3 and 4). Paone's recommendation ($ 129,000) would be only 1.6 percent of gross revenue. Our finding ($ 240,000) is 3.0 percent. Thus, our findings, when compared to gross (or operating) revenues, are about the high end of the range of Paone's comparables and a bit below the middle of the range of Manning's comparables. Finally, in evaluating the significance of the expert witnesses' conclusions, we note that (1) Paone had experience with reasonable compensation and closely held corporations, but did not know much about the trucking industry, and (2) Manning knew about the trucking industry, but had never before done a reasonable compensation analysis. JLI appears to be the heart of Lipps' trucking business operations. JLI has the basic interface with the outside public. Most of Lipps' efforts appear to have been involved with JLI, rather than ARI or AMC. Accordingly, as shown in table 7, supra, we have allocated the bulk of Lipps' reasonable compensation to JLI. We now consider petitioners' contention that some part of the amount paid to Lipps by *354 JLI and ARI in 1975 and 1976 was for services rendered earlier with respect to which payment was postponed. Amounts paid in a later year for earlier years' services may be deducted when paid, if the services were undercompensated in the earlier years. Lucas v. Ox Fibre Brush Co., 281 U.S. 115 (1930); Cropland Chemical Corp. v. Commissioner, 75 T.C. 288, 297-298 (1980), affd. without published opinion 665 F.2d 1050 (CA7 1981); R. J. Nicoll Co. v. Commissioner, 59 T.C. 37, 50-51 (1972).In order to be allowed the deduction, the taxpayer must establish the amount of undercompensation for the earlier services ( American Foundry v. Commissioner, 59 T.C. 231, 239-240 (1972), affd. in part and revd. in part 536 F.2d 289, 293 (CA9 1976)) and that the payment in the later year is intended as compensation for the services. Perlmutter v. Commissioner, 373 F.2d 45, 48 (CA10 1967), affg. 44 T.C. 382, 403 (1965). In the instant cases, petitioners presented us with little more than the claim, and Lipps' general conclusory testimony, that some amount was intended as compensation for earlier years' services. We are not told: how much of the 1975 or 1976 payments were so intended; how the intent *355 was arrived at or formulated; what earlier years' services were being compensated for in 1975 and 1976; what services Lipps performed in the undercompensated years; what those earlier years' services were worth; or what Lipps was paid for those undercompensated services. We conclude that the amounts in dispute in this issue do not include any amounts that were paid for Lipps' services in earlier years. Our findings as to the reasonable compensation for each of the years in issue are set forth in table 7, supra. We treat JLI's payments of "management fees" to ARI as being JLI's payments to Lipps. (Of course, JLI's payments of "terminal agent's fees" to Lipps are additional payments to Lipps.) We treat ARI's payments of "management fees" to Lipps as being ARI's payments to Lipps, but only to the extent that these payments exceed JLI's "management fees" payments to ARI. Thus, for 1975, JLI is treated as having paid $ 186,000 to Lipps and ARI is treated as having paid $ 15,100 to Lipps. For 1976, JLI is treated as having paid $ 307,000 to Lipps and ARI is treated as having paid $ 58,800 to Lipps. For 1975, we hold that JLI's payment of $ 140,000 to ARI as "management fees" is reasonable *356 compensation, deductible by JLI. Since we have found that reasonable compensation for Lipps' services to JLI for 1975 is $ 174,900, we hold that $ 34,900 (i.e., $ 174,900 minus $ 140,000) of JLI's $ 46,000 "terminal agent fee" payment to Lipps is reasonable compensation, deductible by JLI; the remaining $ 11,100 of that payment is not deductible by JLI and is to be treated as a dividend from JLI to Lipps. We have found that reasonable compensation for Lipps' services to ARI for 1975 is $ 15,100. We are treating ARI as having paid $ 15,100 to Lipps. Accordingly, we hold that all of ARI's payment of "management fee" to Lipps is deductible by ARI. For 1976, we hold that JLI's payment of $ 141,000 to ARI as "management fee" is reasonable compensation, deductible by JLI. Since we have found reasonable compensation for Lipps' services to JLI for 1976 is $ 220,000, we hold that $ 79,000 (i.e., $ 220,000 minus $ 141,000) of JLI's $ 166,000 "terminal agent's fee" payment to Lipps is reasonable compensation, deductible by JLI; the remaining $ 87,000 of that payment is not deductible by JLI and is to be treated as a dividend to Lipps. We have found that reasonable compensation for Lipps' *357 services to ARI for 1976 is $ 20,000. We are treating ARI as having paid $ 58,800 to Lipps. However, respondent has ratified his expert's opinion that reasonable compensation from ARI is $ 62,400. (See table 7, supra.) In light of that concession, we hold that all of ARI's payment of "management fee" to Lipps is deductible by ARI. Our holding as to the tax treatment of Lipps' receipts of these amounts from JLI and ARI is consistent with our holdings as to JLI and ARI; the amounts deductible by the corporations are earned income to Lipps and the excess amounts are dividend income to Lipps. We hold for petitioners as to the "management fees". We hold in part for petitioners and in part for respondent as to the "terminal agent's fees". IV. Overhead Charges
A. 1975
Respondent contends that JLI's $ 6,500 payment to ARI must be reallocated to JLI under section 482. He maintains that the payment is a nonarm's-length charge, and that petitioners have failed to prove that ARI incurred any overhead expenses on behalf of JLI for which reimbursement is deductible. Respondent maintains that ARI's $ 5,200 payment to Lipps is not an ordinary and necessary business expense and is not deductible *358 under section 162, and that petitioners have failed to prove that Lipps incurred any overhead expenses on behalf of ARI for which reimbursement is deductible. Respondent concludes that both the $ 6,500 item and the $ 5,200 item are constructive dividends to Lipps. Petitioners contend that both the $ 6,500 item and the $ 5,200 item are ordinary and necessary business expenses of the respective payors and deductible by them. Neither item, they maintain, results in dividend income to Lipps. We agree with respondent that JLI's $ 6,500 deduction is to be disallowed and that ARI's $ 5,200 deduction is to be disallowed. As to the dividends to Lipps, we agree with respondent, but only to the extent of $ 6,500 (rather than the aggregate of $ 11,700 determined by respondent). See section 1.482-1(d)(2), Income Tax Reg., regarding the requirement of correlative adjustments. (1) $ 6,500 -- JLI Deduction
Respondent possesses the power, because of section 482, to distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among commonly controlled organizations, trades, or businesses if he determines that such action is necessary to prevent the evasion of taxes *359 or clearly to reflect their income. Sec. 482. (See n. 19, supra.) Respondent's determinations as to section 482 allocations are to be set aside only if the determinations are "unreasonable, arbitrary, or capricious". Jordan v. Commissioner, supra; Your Host, Inc. v. Commissioner, supra; Grenada Industries, Inc. v. Commissioner, supra.The standard to be applied is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. See sec. 1.482-1(b)(1), Income Tax Regs.
Petitioners presented testimony of their Certified Public Accountant as to what the $ 6,500 overhead payment was for. At one point the witness said that the overhead payments from JLI to ARI arose because JLI and ARI "were in common quarters, used common employees, used common office equipment and so forth." On the next page of the transcript, he testified that the overhead payments "involved the basic charges for insurance, telephone, utilities and items of that nature." We have not found, and the parties have not directed our attention to, other evidence in the record bearing persuasively on the $ 6,500 overhead item. Petitioners have not presented evidence showing that JLI received *360 the benefit of expenditures that ARI made, which were properly apportionable to JLI, and which were not otherwise deducted on JLI's tax returns. Petitioners assert that the JLI-to-ARI overhead items are part of the ARI-to-Lipps overhead items. Petitioners have not presented evidence showing that Lipps paid the "insurance, telephone, * * * utilities [and] items of that nature" (as summarily stated by their Certified Public Accountant), nor that JLI or ARI derived benefits from any such payments by Lipps. Petitioners have not presented evidence showing how they determined the amounts of the overhead payments. The foregoing falls far short of meeting petitioners' burden of proving that respondent's section 482 allocation is "unreasonable, arbitrary, or capricious". We hold for respondent on this issue. (2) $ 5,200 -- ARI Deduction
Section 162(a) (see n. 18, supra) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Section 1.162-1(a), Income Tax Regs., provides the general rule that deductible business expenses "include the ordinary and necessary expenditures directly connected with or pertaining *361 to the taxpayer's trade or business". Thus, to satisfy the requirements of section 162(a), an expense must be ordinary and necessary and must have the requisite relationship to the taxpayer's business. Petitioners presented testimony of their Certified Public Accountant as to what the $ 5,200 overhead payment was for. The witness explained the payment from ARI to Lipps as follows: "Mr. Lipps personally incurred a number of expenses. Namely, insurance, telephone, I believe utilities; items of that nature." We have not found, and the parties have not directed our attention to, other evidence in the record bearing persuasively on the $ 5,200 overhead item. Payments by corporations to their controlling shareholders must be examined with special care. Tulia Feedlot, Inc. v. United States, supra; Ingle Coal Corporation v. Commissioner, 174 F.2d 569, 571 (CA7 1949), affg. 10 T.C. 1199 (1948). Petitioners must show the nature and amount of Lipps expenditures that were being reimbursed. Petitioners must show the nature and extent of ARI's and JLI's benefits from Lipps' expenditures. The one witness' summary comment falls far short of meeting this burden of proof. We hold for respondent *362 on this issue. (3) Dividends to Lipps
We consider first the $ 6,500 payment from JLI to ARI, and then the $ 5,200 payment from ARI to Lipps. Generally, distributions of property of a corporation with respect to its stock out of its earnings and profits are taxable to the shareholder receiving the distribution. Secs. 61(a)(7), 301(a), 301(c), and 316(a). However, a shareholder will be taxed on dividend income even though the shareholder did not receive any actual distribution when funds are transferred from one corporation to another related corporation primarily for the personal benefit of the common controlling shareholder. Gulf Oil Corp. v. Commissioner, 87 T.C. 548, 565 (1986), on appeal (CA3, Dec. 1, 1989); see Ross Glove Co. v. Commissioner, 60 T.C. at 595.Intercorporate transfers which are altered by a section 482 allocation may fall within this category. Engineering Sales, Inc. v. United States, 510 F.2d 565 (CA5 1975); Sparks Nugget, Inc. v. Commissioner, 458 F.2d 631 (CA9 1972), affg. a Memorandum Opinion of this Court. [20] A transfer from one corporation to another corporation will be a constructive dividend to a common controlling stockholder if (1) the transfer caused *363 property to leave control of the transferor corporation and thereafter the stockholder was able to exercise control over the property, directly or indirectly, through some instrumentality other than the transferor corporation and (2) the transfer was prompted by a shareholder purpose of the common owner rather than a business purpose of the transferring corporation. Sammons v. Commissioner, 472 F.2d 449, 451 (CA5 1972), affg. in part, revg. in part, and remanding a Memorandum Opinion of this Court; [21]Gulf Oil Corp. v. Commissioner, 87 T.C. at 565. In the instant cases, the first test is met because Lipps controlled both JLI and ARI and after the transfer, Lipps was able to control the transferred $ 6,500 because of his control of ARI. The issue as to the $ 6,500 then hinges on the second test -- whether the transfer was made primarily for a business purpose of JLI or primarily to benefit Lipps. Respondent contends that whenever a section 482 reallocation results from a greater-than-arm's-length payment by one commonly controlled corporation to another "the amount of the allocation will be treated as a distribution to the controlling *364 shareholder with respect to the stock of the entity whose income is increased and as a capital contribution by the controlling shareholder to the other entity involved in the transaction", except in those "unusual circumstances when nonshareholder contribution to capital treatment under section 118 is appropriate." We have examined respondent's approach. We have rejected it in the past. White Tool and Machine Co. v. Commissioner, 677 F.2d 528, 529 (CA6 1982), affg. a Memorandum Opinion of this Court; [22]R. T. French Co. v. Commissioner, 60 T.C. 836, 854-856 (1973). See generally W. Cliff and B. Cohen, "Collateral Fictions and Section 482", 36 Tax Lawyer 37 (1982). We still reject it. A transfer by one corporation to a "brother-sister" corporation will be treated as constructive dividend to the common shareholder only if the transfer was made for the benefit of the common shareholder. The mere fact that we upheld respondent's section 482 reallocation back to the transferor does not require that we uphold respondent's determination that the reallocated amount is a constructive dividend. Although we reject respondent's analysis, we agree with respondent's conclusion *365 as to the treatment of the $ 6,500. We do so for the same reason that we agree with respondent's disallowance of JLI's claimed deduction on account of its payment to ARI: i.e., petitioners' failure to present persuasive evidence that the intercorporate transfer was not made for Lipps' benefit. When we come to the $ 5,200 payment from ARI to Lipps, the result is different. There, too, petitioners have failed to persuade us that the payment is not a dividend to Lipps. However, it strikes us that the $ 5,200 that ARI paid to Lipps is merely a part of the $ 6,500 that JLI paid to ARI. In effect, respondent's notices of deficiency would have us treat the two payments as though (1) Lipps received a dividend of $ 6,500 from JLI, (2) Lipps contributed the $ 6,500 to JLI, and (3) Lipps received a dividend of $ 5,200 from ARI. Respondent determined that this gave rise to dividends of $ 11,700 to Lipps. We prefer to consider the overhead payments as a package. At the end, JLI had $ 6,500 less than it started with, ARI had $ 1,300 more than it started with, and Lipps had $ 5,200 more than he started with. This shift produces dividends totalling $ 6,500 (the $ 5,200 that Lipps retained, *366 plus the net $ 1,300 that made its way from JLI to ARI). We hold in part for respondent and in part for petitioners on this issue. B. 1976
(1) $ 6,500 -- JLI Deduction
Respondent contends that the $ 6,500 overhead payment made by JLI to ARI in 1976 was a "non-arm's length" charge that must be reallocated back to JLI under section 482. Petitioners contend that respondent's disallowance of JLI's overhead deduction should be rejected because "the Commissioner offered no evidence and plainly failed to meet his burden of proof." We agree with petitioners. Because respondent first raised this issue in amendment to answer, the burden of proof lies with him. Rule 142(a); Reiff v. Commissioner, 77 T.C. 1169, 1173 (1981); Achiro v. Commissioner, 77 T.C. 881, 890-891 (1981). On brief, respondent treats this item together with the corresponding 1975 payment. He refers to petitioners' burden of proof; he ignores his own burden of proof. The same lack of evidence that causes petitioners to lose on this issue for 1975, causes respondent to lose on this issue for 1976. We hold for petitioners on this issue. [23] *367 (2) $ 5.200 -- ARI Deduction
For the reasons discussed in A. 1975 (2) $ 5,200 -- ARI Deduction , supra, we hold for respondent on this issue. [24]
V. ARI -- Accrued Items
A. 1975
(1) Airplane Rent
Respondent contends *368 that ARI, an accrual basis taxpayer, should have accrued and reported $ 14,000 of airplane rent income (the income for the period Sep. 1, 1974, through Apr. 30, 1975) for its 1975 taxable year. Petitioners maintain that ARI's billing of JLI was the event triggering the accrual and that this occurred in ARI's 1976 taxable year, thus ARI's method of accounting properly required accrual of the income for ARI's 1976 taxable year. We agree with respondent. Section 451(a) [25] provides in general that income is recognized for the year in which the income is received unless, under the taxpayer's method of accounting, it is properly recognized for a different period. Section 446(a) [26] *370 provides the general rule that taxable income is to be computed using the method of accounting under which the taxpayer regularly computes income in keeping the taxpayer's *369 books. Section 446(b) [27] gives respondent broad discretion to require the use of a method of accounting that clearly reflects the taxpayer's taxable income. Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532 (1979); Commissioner v. Hansen, 360 U.S. 446, 467 (1959).Respondent's authority is not limited to a rejection of only an overall method of accounting but, instead, he may exercise this authority with respect to the treatment of an individual item of income or expense. Sec. 1.446-1(a)(1), Income Tax Regs.; Keller v. Commissioner, 725 F.2d 1173, 1179 (CA8 1984), affg. 79 T.C. 7, 38 (1982); Burck v. Commissioner, 533 F.2d 768, 772-773 (CA2 1976), affg. 63 T.C. 556, 561 (1975); Resnik v. Commissioner, 66 T.C. 74, 78 (1976), affd. 555 F.2d 634 (CA7 1977); Cole v. Commissioner, 64 T.C. 1091, 1103 (1975), affd. 586 F.2d 747 (CA9 1978).The taxpayer has a heavy burden of proof in establishing that respondent abused his discretion under this provision. Resnik v. Commissioner, 66 T.C. at 78; Cole v. Commissioner, 64 T.C. at 1103. Under an accrual method of accounting, income is recognized for the taxable year when all the events have occurred which fix the right to receive the income, and the amount can be determined with reasonable accuracy. Secs. 1.446-1(c)(1)(ii) and 1.451-1(a), Income Tax Regs. Under this test, it is the right to receive income which is controlling and not whether the income was actually received. Spring City Co. v. Commissioner, 292 U.S. 182, 184-185 (1934); Resale Mobile Homes, Inc. v. Commissioner, 91 T.C. 1085, 1092 (1988). In the instant cases, ARI billed JLI $ 21,000 on August 31, 1975, for *371 airplane rent attributable to the period September 1, 1974 through August 31, 1975. The rent was calculated at a rate of $ 1,750 per month. Consequently, $ 14,000 of rent was earned through April 30, 1975, ARI's taxable year end. The mere fact that ARI had not billed JLI for this rental charge during ARI's 1975 taxable year does not mean that ARI need not recognize the income in the year the rental service was provided. The billing function, in and of itself, is ordinarily a ministerial act which has no effect on the timing of revenue recognition. See Orange & Rockland Utilities v. Commissioner, 86 T.C. 199, 214 (1986); Cox v. Commissioner, 43 T.C. 448, 458 (1965).Where a contract provides that an amount is not billable and payment is not due until a later date, we have held that all events which fix the rights to that income have not occurred until actual billing. Decision, Inc. v. Commissioner, 47 T.C. 58 (1966).However, petitioners have not shown, and we do not believe there exists in the instant cases, any contractual infirmity preventing the billing of the rent concededly incurred as of April 30, 1975. Consequently, we conclude that all events that fixed ARI's rights *372 to the $ 14,000 of rental income had occurred by April 30, 1975, and that ARI must recognize the income for its taxable year ending thereon. Petitioners contend that because ARI's book entries consistently reflect a course of dealing, that we should infer therefrom that the billing date held a contractual significance. However, petitioners did not direct us to evidence from which such a conclusion could be drawn. Both sides discuss Cox v. Commissioner, supra. However, the issue in dispute in the instant cases was not in dispute in Cox. The corporation in Cox reported all income attributable to periods (attribution determined by daily proration) during its fiscal year, whether or not that income had been received or billed by the end of its fiscal year. 43 T.C. at 454-455. The dispute in Cox related only to income attributable to periods after the end of the corporation's fiscal year; the dispute in the instant cases relates only to income attributable to periods during ARI's fiscal year. Thus Cox supports respondent, but does so not because of what we decided in Cox but rather because of what was deemed to be so clear that the taxpayer in Cox did not even dispute it. On brief, *373 petitioners claim that, under Rev. Proc. 70-27, 1970-2 C.B. 509, ARI is "entitled to ratable adjustments over a ten-year period." Rev. Proc. 70-27 prescribes how a taxpayer is to apply for respondent's consent to the taxpayer's request for permission to change accounting practices or methods. If consent is granted, then it may be that a resulting adjustment would be spread over 10 years (sec. 3.01 of Rev. Proc. 70-27). However, nothing in the record indicates that ARI made such a request. (Sec. 4.03 of Rev. Proc. 70-27 sets forth detailed procedures for making such a request.) Also, as respondent points out on answering brief, Rev. Proc. 70-27 has been superseded by the extraordinarily detailed rules of Rev. Proc. 80-51, 1980-2 C.B. 818. Without examining into the details of Rev. Proc. 80-51 (see, especially, sec. 4.01(3)(c)), it suffices to say that petitioners have also failed to show that they requested permission in accordance with the requirements of Rev. Proc. 80-51. (Rev. Proc. 80-51 has in turn, been clarified, modified, and superseded by Rev. Proc. 84-74, 1984-2 C.B. 736.) Petitioners have not shown that they are entitled to a 10-year spread (or any spread) of the $ 14,000 *374 adjustment involved in this issue. We hold for respondent on this issue. (2) Building Rent
On August 31, 1975, ARI billed JLI $ 15,000 for building rent attributable to the period September 1, 1974, through August 31, 1975. There was no written lease agreement between JLI and ARI relating to this building rent. ARI reported the $ 15,000 of building rent in its income for its taxable year ended April 30, 1976. Respondent contends that ARI should have accrued and reported $ 10,000 building rent income (the income for the period Sept. 1, 1974, through Apr. 30, 1975) for its 1975 taxable year. Petitioners' contentions are the same as that for the airplane rent. For the reasons stated above with regard to airplane rent income, we hold for respondent on this issue. B. 1976
(1) Demurrage
Respondent contends that, of the $ 137,660 trailer demurrage charge that ARI billed to JLI on August 31, 1976, $ 80,454.79 is attributable to the period September 1, 1975, through April 30, 1976, and should have been included in ARI's income for its taxable year ended April 30, 1976. [28] Petitioners contend that the Court lacks jurisdiction over this issue. In the alternative, petitioners contend that all *375 events had not transpired which fix ARI's right to receive this income, and the amount due could not be reasonably ascertained until after the end of its 1975 taxable year. We agree with respondent that we have jurisdiction as to this issue; we agree with petitioners on the substance. For the reasons discussed above (II. Jurisdiction), *376 we conclude that we have jurisdiction to decide this issue. Because respondent first raised this issue in amendment to answer, the burden of proof lies with him. Rule 142(a); Reiff v. Commissioner, 77 T.C. at 1173. Under an accrual method of accounting, income is recognized for a taxable year if, by the end of that year, all the events have occurred which fix the right to receive the income and the amount can be determined with reasonable accuracy. Sec. 1.451-1(a) , Income Tax Regs. Under this test, it is the right to receive income which is controlling, and not whether there has been an actual receipt thereof. Spring City Co. v. Commissioner, supra.
The parties' dispute focusses on whether the amount of the trailer demurrage for the period September 1, 1975, through April 30, 1976, could be determined with reasonable accuracy by April 30, 1976, the end of ARI's 1976 taxable year. Lipps testified that he determined the trailer demurrage rate each year based on the extent to which the trailers were idle during the year and that he did so at the end of the year. This was done at the end of JLI's taxable year -- August 31. However, respondent points out that the demurrage rate was *377 10 percent of load revenues for each of the billings of August 31, 1975, 1976, 1977, 1978, and 1979, which indicates that there was no built-in uncertainty and that the demurrage amount could be determined with reasonable accuracy by April 30, 1976. Black's Law Dictionary (5th ed. 1979) describes demurrage as follows (p. 389): Demurrage * * *. In maritime law, the sum which is fixed by the contract of carriage, or which is allowed, as remuneration to the owner of a ship for the detention of his vessel beyond the number of days allowed by the charter-party for loading and unloading or for sailing. Also the detention of the vessel by the freighter beyond such time. With respect to railroads a charge exacted by a carrier from a shipper or consignee on account of a failure on the latter's part to load or unload cars within the free time prescribed by the applicable tariffs; the purpose of the charge is to expedite the loading and unloading of cars, thus facilitating the flow of commerce, which is in the public interest. St. Louis, Southwestern Ry. Co. v. Mays, D.C.Ark., 177 F.Supp. 182, 183.Demurrage is extended freight and is the amount payable for delays by receiver in loading or *378 unloading cargo; it is stipulated damages for detention. Hellenic Lines, Limited v. Director General of India Supply Mission for and on behalf of Union of India, D.C.N.Y., 319 F.Supp. 821, 831.
As applied to the business involved in the instant cases, demurrage is a charge by the trailers' lessor (ARI) for the time that the trailers are idle and are thus not producing rental income to the lessor, even though the trailers are still in the possession of the lessee (JLI). Thus, if the payments are truly for demurrage, then one would expect that the demurrage amount is more when the trailers are idle (and not producing rental income) and the demurrage amount is less when the trailers are being used (and are producing rental income). Respondent's view of a preordained demurrage rate of 10 percent of load revenues produces results precisely opposite to the function of demurrage; i.e., the demurrage amount is more if the trailers are being used and the demurrage amount is less if the trailers are idle. Yet, respondent does not dispute the character of these amounts as demurrage. Given that these amounts are demurrage, and that the base for calculating these amounts is load revenues, it *379 must be that the demurrage percentage rate would vary in the same direction as the idleness rate. This creates substantial uncertainty in determining the amount of the demurrage, until substantially all of the information for the year is in. We conclude that, on April 30, 1976, the demurrage amount for the period September 1, 1975, through April 30, 1976, could not be determined with reasonable accuracy. We hold for petitioners on this issue. (2) Trailer Rent
Each week (generally on Monday) during the relevant years, JLI paid to ARI, as trailer rent, an amount equal to 10 percent of the load revenues attributable to 47 trailers leased by ARI to JLI. On Monday, May 3, 1976, JLI paid (and ARI received) $ 2,200.89, an amount equal to 10 percent of the load revenues received by JLI the week before. Petitioners maintain that ARI properly accounted for this amount as income in the year it received the payment, because "all events had not transpired as of April 30, 1976, which fixed ARI's right to that income, and the amount thereof was not reasonably ascertainable until after that time." Respondent contends that ARI, as an accrual basis taxpayer, should have taken this amount into income *380 in its taxable year ended April 30, 1976. We agree with respondent. Petitioners, who have the burden of proof on this issue, have not disclosed what events were necessary to fix ARI's right to this trailer rent payment but had not yet occurred by April 30, 1976. Nor have they told us what it was that made the amount of the trailer rent payment not reasonably ascertainable as of April 30, 1976. Petitioners have failed to carry their burden of proof. We hold for respondent on this issue. (3) Six Income Items Totalling $ 1,591.03
The parties' contentions as to the six items shown in table 8, supra, totalling $ 1,591.03, are the same as for the $ 2,200.89 trailer rent item, discussed supra. The only differences from the Court's point of view are that (1) this list (i.e., table 8) had been given to respondent's agent by an assistant to petitioners' C.P.A. as items that were accounts receivable as of "4-30-76", and (2) the parties have presented us even less information about these items than they presented as to the $ 2,200.89 trailer rent item. We hold for respondent on this issue. VI. JLI 1976 -- Accrued Freight Income
JLI, as a shipper of goods, realizes income from the performance *381 of shipping services. As an accrual basis taxpayer, JLI must recognize this income in the year in which (1) the amount is reasonably ascertainable, and (2) all events have occurred which fix JLI's right to receive the income. Sec. 1.451-1(a), Income Tax Regs. The parties agree that these two tests are met when the shipment is delivered to the consignee. JLI, with a few exceptions of only minor relevance, keeps no record of the date of delivery. JLI does keep a record of the loading date of the goods to be shipped. JLI paid 65 percent of gross freight revenues to truck drivers who furnished their own tractors but used trailers supplied by JLI, and 75 percent of gross freight revenues to truck drivers who furnished both their own tractors and their own trailers. JLI typically advanced about one-half of the driver's share of the gross freight revenues before the driver left the JLI terminal to pick up the shipment. JLI paid the balance to the driver only after the shipment was delivered to the consignee. For its taxable year ended August 31, 1976, JLI claimed deductions totalling $ 29,569.18 for amounts due to drivers on loads for which freight revenues totalling $ 64,426.21 had *382 not been accrued into income. Respondent contends that freight revenue totalling $ 63,495 [29] shown on JLI's revenue bills (1) which reflect a loading date during JLI's 1976 taxable year, and (2) as to which JLI deducted the driver's unpaid share of the freight revenue, should be presumed to have been delivered in JLI's 1976 taxable year. Petitioners maintain that some of the freight bills on the basis of which JLI claimed a deduction for unpaid amounts due to lessor-drivers related to shipments that were loaded during its 1976 taxable year but which were not delivered until after August 30. For this reason, petitioners maintain that respondent was arbitrary in determining that JLI should recognize the freight revenue from these transactions in its 1976 taxable year. We agree largely with respondent. Petitioners have *383 the burden of proof. We have examined the stipulated revenue bills, interoffice billings and shipping orders. One of the August 31, 1976, loads and three of the August 30, 1976, loads show receipts dated September 1 or 2. We are satisfied that all the other four August 31, 1976, loads and two of the other five August 30, 1976, loads (see table 9, supra) also were received on or after September 1, 1976, and we have so found. As to the remaining loads, in many instances the evidence is clear that the loads were delivered before September 1, 1976; in others, the evidence is unpersuasive, and so petitioners must accrue these items. We hold in part for respondent and in part for petitioners on this issue. To reflect the foregoing and because of concessions by all parties involved, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Astro Rentals, Inc., docket Nos. 11453-78 and 14021-79; Astro Manufacturing, Inc., docket No. 14020-79; Jerry Lipps and Ruth Lipps, docket No. 7990-79; and Jerry Lipps, Inc., docket No. 1368-80.↩
2. By an amendment to answer, respondent asserts in docket No. 1368-80 an additional deficiency in the amount of $ 70,800, for a total deficiency against Jerry Lipps, Inc., for its taxable year ended August 31, 1976, in the amount of $ 188,066.29. ↩
3. By an amendment to answer filed before the trial, respondent asserts in docket No. 14021-79 an additional deficiency in the amount of $ 36,505.44, for a total deficiency against Astro Rentals, Inc., for its taxable year ended April 30, 1976, in the amount of $ 158,661.86. By a second amendment↩ to answer lodged after the last brief was filed in the instant cases, respondent asserts in docket No. 14021-79 (in lieu of the earlier amendment to answer) an additional deficiency in the amount of $ 38,618.30, for a total deficiency against Astro Rentals, Inc., for its taxable year ended April 30, 1976, in the amount of $ 160,774.72
4. Petitioners have not directed our attention to any evidence (and did not make any arguments on brief) as to the following issues: (1) whether petitioners Jerry Lipps and Ruth Lipps had dividend income in 1975 from petitioner Jerry Lipps, Inc., in the amount of $ 1,363.13 for "master charge expenses", (2) whether $ 4,300 of lease expenses accrued by petitioner Astro Rentals, Inc., for its taxable year ended April 30, 1976, is deductible as an ordinary and necessary business expense, (3) whether $ 656.82 deducted by Jerry Lipps, Inc., for its taxable year ended August 31, 1976, was an ordinary and necessary business expense, and (4) whether $ 333.22 deducted by Jerry Lipps, Inc., for its taxable year ended August 31, 1976, was an ordinary and necessary business expense. Petitioners are deemed to have conceded these issues. See subparagraphs (4) and (5) of Rule 151(e). Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice & Procedure.↩
5. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the years in issue; references to section 6214(a)↩ are references to that section of the Internal Revenue Code of 1954 as in effect for the dates when the amendments to answers in the instant cases were filed.
6. Although petitioners have conceded all the issues raised by the notice of deficiency in AMC's docket, AMC remains a party in these consolidated cases (see DeLucia v. Commissioner, 87 T.C. 804↩ (1986)) and figures to some extent in the facts relating to the other petitioners.
7. So stipulated. Lipps' testimony indicates that the remaining 10 percent of ARI's and AMC's stock was not issued to anyone and that Lipps owned 100 percent of ARI's and AMC's outstanding stock.↩
8. The Cape Girardeau amount includes the Wickliffe terminal for September 1, 1974, through August 31, 1975. Separate figures are not available for Wickliffe for this period. ↩
9. Information about these terminals for 1975 was not included in the record in the instant cases.↩
10. Because Lipps and petitioner Ruth Lipps did not report any costs of goods sold, the amounts reported as gross receipts and the amounts reported as gross profit were identical during the listed years.↩
*. Amounts in thousands.↩
*. Amounts in thousands.
11. Under section 1564(a), for taxable years including December 31, 1974 (i.e., the corporate petitioners' taxable years ending in 1975), a controlled group of three corporations was limited to one $ 25,000 surtax exemption plus two $ 4,167 surtax exemptions; the group could elect which member would take the unreduced $ 25,000 surtax exemption.↩
*. Amounts in thousands↩
*. This treats the payments from JLI to ARI as subsumed in the payments from ARI to Lipps.↩
12. Our findings on this matter would appear to apply equally to the 27 trailers that Lipps leased to ARI, and that ARI in turn leased to JLI. However, the stipulations on this issue seem to deal only with the 47 trailers that ARI owned, and so we have confined our findings to those 47 trailers. ↩
13. The term "load revenues" as used herein refers to the gross receipts due as a result of transporting cargo for customers.↩
14. We also have authority to resolve all questions relating to issues of our jurisdiction, including ancillary matters. Weiss v. Commissioner, 88 T.C. 1036 (1987), implicitly affd. on this issue, but revd. on another issue 850 F.2d 111 (CA2 1988) (litigation costs); Versteeg v. Commissioner, 91 T.C. 339↩ (1988) (counsel fees under Rule 33(b)).
15. SEC. 6214. DETERMINATIONS BY TAX COURT. (a) Jurisdiction as to Increase of Deficiency, Additional Amounts, or Additions to the Tax. -- Except as provided by section 7463, the Tax Court shall have jurisdiction to redetermine the correct amount of the deficiency even if the amount so redetermined is greater than the amount of the deficiency, notice of which has been mailed to the taxpayer, and to determine whether any additional amount, or any addition to the tax should be assessed, if claim therefor is asserted by the Secretary at or before the hearing or a rehearing. [This text includes an amendment enacted by sec. 1554(a) of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085, 2754), which applies to any action or proceeding in this Court with respect to which a decision had not become final before October 22, 1986.]↩
16. Respondent initially took the position that all these amounts (except for $ 100 of the $ 155,100 that ARI paid to Lipps in 1975 and $ 900 of the $ 199,800 that ARI paid to Lipps in 1976) were dividends to Lipps and nondeductible by the payors. At trial, respondent conceded that reasonable compensation to Lipps would have been $ 118,300 in 1975 and $ 129,000 in 1976, which amounts were apportioned between JLI and ARI in respondent's concession (see table 7, supra↩).
17. T.C. Memo. 1967-7↩. 18. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including -- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *↩
19. SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. [The subsequent amendments of this provision (by sec. 1906(b)(13)[sic](A) of the Tax Reform Act of 1976 (Pub. L. 94-455, 90 Stat. 1520, 1834), and sec. 1231(e)(1) of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085, 2562-2563)) do not affect the instant cases.]
20. T.C. Memo. 1970-74↩. 21. T.C. Memo. 1971-145↩.
22. T.C. Memo. 1980-443↩.
23. On brief respondent states that the 1976 $ 6,500 item, as well as the 1975 item, "should be * * * treated as constructive dividends to Mr. Lipps↩." (Emphasis in original.) Lipps' 1976 income tax liability is not before us. Our holding for petitioners as to JLI's deduction -- based entirely on the burden of proof -- is not a holding as to how the $ 6,500 payment from JLI to ARI should have been treated by Lipps on his tax return for 1976.
24. On brief, respondent indicates that the 1976 $ 5,200 item is a dividend to Lipps. Lipps' 1976 income tax liability is not before us. Our holding for respondent as to ARI's deduction -- based entirely on the burden of proof -- is not a holding as to how the $ 5,200 receipt should have been treated by Lipps on his tax return for 1976. On page 91 of their opening brief, petitioners state that "ARI's 1976 overhead deduction has not been disallowed." As respondent points out in his answering brief, on page 10-11 of petitioners' opening brief they explicitly acknowledge that respondent disallowed ARI's 1976 $ 5,200 deduction.↩
25. SEC. 451. GENERAL RULE FOR TAXABLE YEAR OF INCLUSION. (a) General Rule. -- The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.↩
26. SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING. (a) General Rule. -- Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books. 27. SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING. * * * (b) Exceptions. -- If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income. [The subsequent amendment of this provision by sec. 1906(b)(13)[sic](A) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1834, does not affect the instant cases.]↩
28. Respondent points out that, for ARI's taxable year ended April 30, 1976, ARI already included 12 months of trailer demurrage -- the $ 75,795 that ARI billed on August 31, 1975. Respondent states that $ 44,075 of this $ 75,795 is attributable to the period September 1, 1974, through April 30, 1975, and concedes that (under the accrual method) the $ 44,075 thus should be excluded from ARI's income for its taxable year ended April 30, 1976. Respondent next contends that his $ 80,454.79 adjustment constitutes a change of accounting method that brings section 481(a) into play (see, e.g., Thomas v. Commissioner, 92 T.C. 206, 227-229↩ (1989)), and that under section 481(a) the $ 44,075 comes back into ARI's income for its taxable year ended April 30, 1976. Thus, the net of the adjustments on this issue is $ 80,454.79 (i.e., $ 80,454.79 minus $ 44,075 plus $ 44,075).
29. Respondent orally conceded at trial that the revenue from the two freight bills shown on table 9, supra↩, with September 1 loading dates, is not accruable for JLI's 1976 taxable year. The revenue from these two conceded freight bills totals $ 931.24. After this is subtracted from the original $ 64,426.24, the remaining 94 disputed freight bills total $ 63,495 revenue.